UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IGENTRY WILSON,                          )
                                         )
                Plaintiff,               )
                                         )   Case No. 09-cv-4183
        v.                               )
                                         )   Judge John W. Darrah
ARCHER DANIELS MIDLAND                   )
COMAPANY,                                )
                                         )
                Defendant.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Igentry Wilson, brought this action against Defendant, Archer Daniels

Midland Company ("ADM"), alleging various acts of employment discrimination. ADM

moved for summary judgment on all claims.

## BACKGROUND

The following facts are taken from the parties' statements of undisputed material

facts submitted in accordance with Local Rule 56.1.[1]

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to
provide "a statement of material facts as to which the moving party contends there is no
genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each
factual statement proffered by the moving party and to concisely designate any material
facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*,
403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its
opponent's statement in the manner required by Local Rule 56.1 results in those facts'
being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d
680, 683 (7th Cir. 2003). Many of Wilson's responses to ADM's statements were
missing, incomplete, or lacking in evidentiary support. Accordingly, many of ADM's
statements are deemed admitted, including those specifically discussed below.

Wilson seeks recovery under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. § 12101 *et seq.* (Def. 56.1(a) ¶ 3.)

Igentry Wilson is an African American woman. (*Id.* ¶ 1.) ADM is an agricultural processing company, headquartered in Decatur, Illinois. (*Id.* ¶ 2.) ADM uses a computerized Enterprise Asset Management System, known as "Maximo," in its plants around the world. (*Id.* ¶ 6.) ADM's Maximo Team, which consists of Business Analysts, Application Support Analysts, and Inventory Analysts, supports employees (i.e., end users) who use Maximo applications for purchasing, spare-parts inventory, work orders, preventative maintenance, equipment tracking, and electronic approval for expenditures. (*Id.* ¶¶ 7-8.)

Rodger Reed, the Application Support Supervisor for Maximo, managed Business Analysts and Application Support Analysts on the Maximo Team. (*Id.* ¶ 9.) He reported to Kim Beals, Application Support Manager and Director of Plant Applications. (*Id.* ¶ 9; Pl. 56.1(b) ¶ 4.) The Maximo Team as a whole reported to Nancy Carlson, Senior Director of IT Plant Applications. (Def. 56.1(a) ¶ 9.)

*Wilson's Performance History*

Beals hired Wilson for the Maximo Team on October 31, 2005, as an hourly, at-will, part-time IT Application Support Analyst I, reporting directly to Reed. (*Id.* ¶ 10.) Wilson's job duties included providing telephone support to end users. (*Id.* ¶ 11.) Beals hired Wilson to ensure there was someone to cover the phones at all times in the call center, particularly between 4:30 and 5:00 p.m. after Wilson's coworkers' shifts ended.

(*Id.* ¶ 12.) Wilson was the only employee on the Maximo Team who performed this function. (*Id.* ¶ 12.) She has some computer degrees, but she did not have any previous experience working with Maximo or any other Enterprise Asset Management System. (*Id.* ¶¶ 68; Pl. 56.1(b) ¶ 27.) She received the same on-the-job training as all other ADM employees in her position, which included sitting with other team members, reviewing documentation, asking questions of her coworkers and supervisors, and attending occasional formal training sessions offered by ADM. (Def. 56.1(a) ¶ 69.)

Reed observed problems with Wilson's performance. First, she was frequently late to work. (*Id.* ¶ 13.) She offered various excuses for her tardiness, including having to attend criminal hearings with her son, having to care for her grandparents, and a purported medical condition. (*Id.* ¶ 13.) Second, Reed received feedback from Wilson's coworkers and from end users that she was, at times, rude and unclear in her communications. (*Id.* ¶ 14.) Wilson's supervisors counseled her regarding the importance of coming to work on time and improving her communications with coworkers and end users. (*Id.* ¶ 15.)

On July 7, 2006, Wilson applied for a Business Analyst position that was posted on ADM's website. (*Id.* ¶ 42.) The online posting stated that ADM sought candidates for this position who possessed good time-management and customer-service skills, a four-year degree in business or engineering, an aptitude for learning new software, up to three years of business or plant experience, and strong communications skills. (*Id.* ¶ 42.)

Beals selected Tony Slager, another ADM employee who also expressed interest in the position. (*Id.* ¶¶ 43, 44.) Slager had worked for ADM for four years – first in a

3

plant utilizing the purchasing, inventory, and receiving functions that Maximo supports; then, in a position in the Maximo Catalog Department, where he had been reporting up to Beals. (*Id.* ¶ 43.) At the time Slager expressed interest in the Business Analyst position, the department in which he worked was overstaffed, and Slager's skills were being under-utilized. (*Id.* ¶ 44.) Based on her experience supervising Slager, Beals believed Slager possessed the business acumen and verbal-communication skills that are critical for the Business Analyst position and that his skills could be better utilized in that role. (*Id.* ¶ 44.)

On November 1, 2006, Reed gave Wilson her first written performance review for the period between November 1, 2005, and November 1, 2006. (*Id.* ¶ 17.) She was rated, "Meets Expectations," and given a 3.2 percent pay increase. (*Id.* ¶¶ 17, 71.) Reed commented in the review, however, that he would like to see Wilson improve her interpersonal skills with her coworkers. (*Id.* ¶ 18.) Reed does not believe that Wilson's interpersonal skills improved after that review. (*Id.* ¶ 19.) For example, in July 2007, Reed witnessed a verbal altercation between Wilson and a coworker, for which he had to counsel both employees that their conduct was inappropriate. (*Id.* ¶ 20.)

In October 2006, Wilson had asked for reduced hours so that she could help her grandmother, and Reed granted her request. (*Id.* ¶ 16.) Then, in July 2007, Wilson told Reed she was experiencing financial difficulties and asked if he would increase her hours. (*Id.* ¶ 21.) Reed agreed and put her on an 8:30 a.m. to 5:00 p.m. shift for about two weeks before returning her to her regular 11:00 a.m. to 5:00 p.m. schedule. (*Id.*)

Wilson claims that on or around September 25, 2007, she applied for a full-time Maximo IT Support Analyst I position and was not selected; but she offers no evidence to show that she did.[2] (*Id.* ¶ 45.) ADM hired another employee, Bobbi Parsons, for the position. (Pl. 56.1(b) ¶ 25.) Wilson was then asked to train her. (*Id.* ¶ 30.) Wilson admits that she does not know who made the decision regarding who would be selected for the position (or for the Business Analyst position), how many candidates were up for each position, or what criteria were used to make the selection decisions. (Def. 56.1(a) ¶ 73.)

On October 5, 2007, Beals and Reed met with Wilson to share concerns about her performance in certain areas, including attendance, tardiness, cell phone usage, dress code, and interpersonal work relationships. (*Id.* ¶ 22; Pl. 56.1(b) ¶ 8.) Wilson told Beals and Reed that a medical condition made it difficult for her to arrive to work on time, but she did not specify the condition or provide proof of any condition. (Def. 56.1(a) ¶ 23.) Reed and Beals informed her that leave opportunities were available through the Family Medical Leave Act if she met certain criteria. (Pl. 56.1(b) ¶ 10.) Wilson perceived the meeting to be a reprimand. (*Id.* ¶ 9.)

On October 15, 2007, Reed asked Wilson to develop her goals for the upcoming year, something he requires from all employees who directly report to him. (Def. 56.1(a)

---

[2] After ADM's Motion for Summary Judgment was fully briefed, Wilson requested leave to file a surreply, arguing that ADM had raised new arguments in its reply brief. Her request was granted. Among other things, Wilson asserts that an email she sent to Reed on June 1, 2006, by which she inquired whether her part-time position would be converted to a full-time position, is proof that she was interested in the position, even though she never specifically applied for it. She offered no other evidence that she expressed any interest in that position, which was not filled until more than fifteen months after her June 1, 2006 email.

¶ 24.) On November 1, 2007, Reed gave Wilson her second annual written performance review; she was again rated, "Meets Expectations," and given a pay raise of 1.7 percent, the same as all other employees with that rating. (*Id.* ¶¶ 25, 70.) Reed again noted that there was room for improvement in Wilson's interactions with her coworkers and end users and encouraged Wilson to ask questions when she did not understand assignments. (*Id.* ¶ 26.)

On November 9, 2007, Carlson and Reed met with Wilson to follow up on the performance issues identified in the October 5 meeting and noted that Wilson had made some improvement with regard to her attendance. (*Id.* ¶ 27; Pl. 56.1(b) ¶ 14.) The number of documented days tardy was reduced from sixteen to fifteen, and it was noted that Wilson did not have any attendance problems since the meeting in October 2007. (Pl. 56.1(b) ¶ 15.) Wilson also spoke with Carlson about being harassed about her hair styles and clothing, things she had previously discussed with Reed. (*Id.* ¶ 16.) Wilson showed noticeable improvements after the meeting. (*Id.* ¶ 32.)

On December 7, 2007, Wilson filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that ADM discriminated against her because she is black and because of her purported disability by

not hiring her for the full-time Maximo IT Support Analyst I position.[3] (Def. 56.1(a) ¶ 45.)

In 2008, an issue arose regarding Wilson's use of paid breaks. Wilson had been combining her two paid breaks with her thirty-minute lunch period to take an extended break between 3:00 p.m. and 4:00 p.m. (*Id.* ¶ 28.) She often came back as late as 4:30 p.m. (*Id.* ¶ 28.) Reed considered this a problem because it prevented Wilson from being present to provide coverage at the end of the day, and he informed Beals of his concerns. (*Id.* ¶ 29.) Beals and Reed consulted Linda Baker, Senior Director of IT Administration, who advised them that, based on ADM policy and applicable law, Wilson's part-time status only entitled her to receive one fifteen-minute break and a thirty-minute, unpaid lunch period. (*Id.* ¶ 30.) On April 15, 2008, Beals and Reed met with Wilson and reminded her that her job was to ensure adequate coverage and support during lunch hours, breaks, and at the end of the workday. (*Id.* ¶ 31.) They also explained that, due to Wilson's six-hour workday, she was only entitled to one 15-minute, paid break. (*Id.* ¶ 32.)

On April 21, 2008, Wilson told Reed she did not want to have her second break "taken away" and requested a meeting to discuss her breaks. (*Id.* ¶ 33.) Beals and Reed

---

[3] Wilson claims she is partially disabled by a "musculo-skeletal disorder," arthritis, pins in her right shoulder, and muscle inflammation. Def. 56.1(a) ¶ 48. However, she had no work restrictions while at ADM; and no medical condition prevented her from driving, taking care of her family, or doing any of the work she was required to do for ADM. (*Id.* ¶ 49.) She occasionally took pain medication that caused her to feel tired and disoriented for a limited period of time, but she was able to function normally when she was not on her medication. (*Id.* ¶ 49.) Wilson's supervisors were aware that she occasionally took pain medication for injuries, but they were unaware of any disability from which she suffered. (*Id.* ¶ 50.)

7

met with her the next day and reiterated that she was only entitled to one 15-minute break because of her part-time status. (*Id.* ¶ 34.) Wilson became angry and left the meeting. (*Id.* ¶ 34.) Shortly after that meeting, Reed believed he heard Wilson give out Reed's home address over the phone. (*Id.* ¶ 35.) Reed asked Wilson to whom she was speaking, and she would not answer. (*Id.*) When Reed said, "I know you gave out my address," Wilson responded, "What? Whatever," and then said to the person on the line, "Yeah baby, that's him." (*Id.*) The person on the line was Wilson's boyfriend, though Reed did not know that at the time. (*Id.* ¶ 35; Pl. 56.1(b) ¶ 39.)

Reed felt threatened by this conduct and informed Beals that he believed Wilson gave his home address out over the phone and that he was fearful of what might happen. (Def. 56.1(a) ¶ 36.) Beals reported the incident to Baker and Carlson. (*Id.* ¶ 37.) Carlson and Beals then decided to terminate Wilson's employment based on her misconduct. (*Id.*) The following day, Wilson met with Beals, Carlson, Baker, and ADM's head of security, Mark Chevron. (*Id.* ¶ 40.) Carlson informed Wilson that her employment was terminated on grounds of insubordination because she gave out Reed's address over the telephone. (*Id.*) Carlson and Beals were aware that Wilson had filed an EEOC charge when they decided to terminate her employment, but they both state that that fact played no role in their decision. (*Id.* ¶ 80.)

Although Wilson acknowledges that her supervisors had the right to change her schedule and set her break times, she believed that Reed changed her break times to prevent her from leaving the building during her break and contends that his actions constitute harassment. (*Id.* ¶ 64.) She also believes that Reed changed her break times,

8

reduced her hours, and terminated her employment in an act of retaliation because she complained about discrimination. (*Id.* ¶ 77.) Wilson admits that she has no personal knowledge of how management disciplined her coworkers. (*Id.* ¶ 65.) No ADM employee reporting to Carlson or Beals has committed misconduct similar to that which led to Wilson's termination. (*Id.* ¶ 41.)

On May 8, 2008, Wilson filed a second charge with the EEOC, alleging race discrimination, disability discrimination, and retaliation based on her termination. (*Id.* ¶ 46.) Neither this charge nor her December 2007 charge alleges any discrimination on the basis of color, national origin, or religion. (*Id.* ¶ 47.)

### Miscellaneous Acts of Alleged Harassment

Wilson also complains of miscellaneous acts of harassment that occurred over the course of her employment at ADM. In December 2005, Wilson found an email on an office printer. (*Id.* ¶ 51.) The email stated, "It's on now girls," above a forwarded copy of an email from Wilson. (*Id.*) Wilson contends this is "harassment" but concedes it has nothing to do with her race. (*Id.*) Wilson complained to Beals about the email, and Beals responded that she does not tolerate such behavior and that she would counsel the individuals involved. (*Id.* ¶ 52.) Beals informed the entire Maximo Team that she would not tolerate harassment of any kind. (*Id.*)

In July 2006, Wilson opened an email in her junk folder and found two emails that contained the subject lines, "Over Powered N-gger" and "Bimbo M." (*Id.* ¶ 56.) The emails consist of various stock listings and nonsensical strings of words. (*Id.* ¶ 58.) These emails did not come from ADM; rather, they originated from fake email accounts

in New Jersey and Paris. (*Id.* ¶ 57.) Wilson reported the emails to Reed and Beals, who expressed concern and referred the matter to ADM's Information Technology Security Department. (*Id.* ¶ 59.) Wilson did not have any further problems with junk email after that. (*Id.*)

Wilson also complains that, during her first year of employment, she was harassed by coworkers when they asked her questions about her hairstyle or clothing. (*Id.* ¶ 62.) In June 2006, Reed looked at an Ebony magazine and asked Wilson, "How do you people do your hair like this?" (*Id.* ¶ 60.) In July 2006, a coworker purportedly suggested that Wilson go with her and another coworker to a tanning salon and Wilson's coworkers laughed in response. (*Id.* ¶ 61.) At a Christmas gathering in 2006 or 2007, Wilson heard Reed tell another employee that the employee is handicapped because he is black. (Pl. 56.1(b) ¶ 35.) Wilson also contends that, on some unspecified date, Reed refused to ask her coworker to remove a screen saver depicting two women on a motorcycle smiling and hugging each other, which Wilson considered to be "sexually explicit" and "religious harassment." (Def. 56.1(a) ¶ 63.)

On October 7, 2007, after Beals sent an email to Wilson (copied to the other managers in the support department) with the words "for your info," Wilson replied to all recipients and told Beals that she thought the words "for your information" are "insensitive and rude." (*Id.* ¶ 54.) In response, Beals advised Wilson that she did not appreciate being called rude and insensitive in an email to other supervisors. (*Id.* ¶ 55.) Wilson admitted acting inappropriately and agreed that the phrase was not racially insensitive. (*Id.*)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

11

## ANALYSIS

Wilson's Amended Complaint does not contain separate counts. Instead, under a heading of "Causes of Action," Wilson generally avers that her action is brought pursuant to the ADA and Title VII for termination of employment, failure to promote, unequal terms and conditions of employment, retaliation, creation of a hostile work environment, and harassment. (*See* Am. Compl. ¶¶ 7-8.) She then presents a long list of allegedly discriminatory conduct (*see id.* ¶¶ 9-47), asserts that ADM's conduct is discriminatory with respect to her race, religion, color, disability, and age (*see id.* ¶ 50), and claims a right to relief pursuant to 42 U.S.C. § 1981 (*see id.* ¶¶ 51-54).

Read liberally, Wilson's Amended Complaint seeks recovery for discrimination (based on race and disability), a racially hostile work environment, and retaliation for complaints of discrimination. To that end, ADM has structured its motion for summary judgment in response to those claims only. Despite Wilson's conclusory allegations that ADM's conduct was discriminatory with respect to her race, religion, color, disability, and age, none of Wilson's specific allegations have anything to do with her age or her religion; and no further discussion on those issues is necessary.

### *ADA*

As a preliminary matter, Wilson cannot prevail on any ADA claims because there is no evidence that she is disabled. The ADA extends protection only to qualified individuals with a disability who are able to perform the essential functions of their employment positions with or without reasonable accommodations. *See Kupstas v. City of Greenwood*, 398 F.3d 609, 611 (7th Cir. 2005) (*Kupstas*). A person has a

"disability" within the meaning of the ADA if she has "a physical or mental impairment that substantially limits one or more of [her] major life activities," a record of such impairment, or is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2).

"Major life activities covered by the ADA include 'functions such as caring for [one's self], performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009) (quoting 29 C.F.R. § 1630.2(i)). A person "substantially limited" in her ability to work must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Kupstas*, 398 F.3d at 612 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). "A plaintiff can never satisfy his burden by showing only that his employer believed that he could not perform a specific job." *Id.* (citations omitted).

Here, Wilson merely asserts that she is partially disabled by a "musculo-skeletal disorder," arthritis, pins in her shoulder, and muscle inflammation. She admits that she never had any work restrictions and has presented no evidence that she was substantially limited in any major life activity while employed at ADM, that she had a record of such a disability, or that ADM regarded her as having such a disability. She merely identifies her own testimony that she occasionally took medication that caused her to be tired and disoriented and that she was able to function normally when not on her medication. This falls far short of a qualifying disability under the ADA. Accordingly, to the extent

Wilson's Amended Complaint sets forth a claim under the ADA, ADM is entitled to judgment as a matter of law.

*Racial Discrimination*

With regard to Wilson's claim that she suffered discrimination on account of her race, Wilson tacitly concedes in her response brief that she has no direct proof of discrimination. In her surreply, however (*see supra* note 2), she asserts that affidavits of her two children and her pastor raise questions of material facts regarding ADM's racial motivations. Her children state that they were at work with Wilson on May 24, 2007, and that, after being introduced to the children and discovering their ages, another employee, Erin Franklin, said, "Gosh you people breed early, you must have started having sex when you were 10 years old." Both children then state that Reed and other employees laughed. As ADM notes, Wilson did not disclose her children under Rule 26(a)(1); and the statements in these late-filed affidavits contradict Wilson's own deposition testimony, in which Wilson said that *after Wilson's daughter left*, Franklin "implied" Wilson was having sex at the age of ten. At any rate, Franklin's comments and Reed's laughter is insufficient evidence that an employment decision made by Beals, Carlson, and Baker almost a year later was the result of racially discriminatory animus.

The affidavit of Wilson's pastor, Dr. Gladies D. Murphy, is similarly of little significance. Dr. Murphy states that she read an email from Mike Jostes (represented to be a computer technician), in which Jostes states that he was instructed by the head of ADM's IT department not to investigate the "Over Power N-gger" email any further. Dr. Murphy also states that Wilson told her she was not paying attention during church

services because her supervisor told her to bring some Maximo documents home to study. These statements do not in any way provide evidence of discriminatory animus on the part of the decision makers at ADM.

Because she has not identified any direct evidence of discrimination, Wilson can defeat ADM's motion for summary judgment only under the indirect, burden-shifting method established in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the indirect method of proof, Wilson must first make out a *prima facie* case of discrimination. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). If Wilson can establish a *prima facie* case, the burden then shifts to ADM to present a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If ADM does so, Wilson must show that ADM's proffered reasons are mere pretext for discrimination. *Id.*

To establish a *prima facie* case of discrimination under the indirect method of proof, Wilson must establish (1) that she is a member of a protected class, (2) that she was meeting ADM's legitimate expectations, (3) that she suffered an adverse employment action, and (4) that another similarly situated individual outside her protected class was treated more favorably. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (*Egonmwan*).[4]

The *prima facie* case for a failure to promote is slightly different: Wilson must show (1) that she is a member of a protected group, (2) that she applied and was qualified for the position sought, (3) that she was rejected for that position, and (4) that the

---

[4] The requirements for proving racial discrimination are the same whether asserted under Title VII or § 1981. *Egonmwan*, 602 F.3d at 850 n.7.

employee promoted was not a member of the protected group and was not better qualified for the position. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003).

Wilson identifies two promotions she did not receive: one to a Business Analyst position and the other to a full-time IT Support Analyst position. With regard to the latter, there is no evidence that she ever applied for that position. As discussed above, Wilson argues that her June 1, 2006 email serves as evidence that she would have applied for the IT Support Analyst position had she known about it. *See supra* note 2. Even if that were true, however, Wilson offered no evidence to show she was qualified for that position (or even what qualifications were necessary for that position). With regard to the Business Analyst position, which was filled by Slager, Wilson's claim that she was better qualified is based only on her own speculative belief. She again identifies no evidence about the qualifications for the position, how she met those qualifications, and how Slager did not. Moreover, Beals, who had been Slager's supervisor for the last of the previous four years Slager worked for ADM, believed Slager possessed the necessary skills and that his skills would be put to better use than in his current department. Wilson, by contrast, had been working under Beals in the Maximo group for less than a year (part-time) and had a record of trouble getting to work on time and problems with her interpersonal skills with coworkers and end users. Accordingly, ADM is entitled to judgment as a matter of law on any claim that Wilson was not promoted for racially discriminatory reasons.

To the extent Wilson claims that other acts on the part of ADM constitute actionable racial discrimination, those claims fail as well. Most of the events of which

she complains do not qualify as adverse employment actions, which must be "materially adverse . . . meaning more than a mere inconvenience or an alteration of job responsibilities." *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685-86 (7th Cir. 2008) (citation and internal quotation marks omitted). Such actions include termination, demotion, a material loss of benefits, and significantly diminished responsibilities. *Id.* at 686. To the extent Wilson asserts claims of discrimination based on reprimands received in meetings, the requirement that she set individual goals, or various comments in the workplace, she falls short of demonstrating that those actions constituted materially adverse employment actions.

The only acts of which Wilson complains that can arguably be classified as adverse employment actions are her alleged reduction in hours and breaks and her termination. However, Wilson has not identified sufficient evidence to support any claims based on those acts. First, her inability to identify a similarly situated non-African American employee who was treated more favorably prevents her from establishing a *prima facie* case. In order to be similarly situated to Wilson, an individual must be directly comparable "in all material respects." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Courts consider such factors as whether the two employees (1) held the same job description, (2) were subject to the same standards, (3) reported to the same supervisor, and (4) had comparable experience, education, and other qualifications. *Id.* A plaintiff also must show that the other employee had a comparable set of failings. *Id.*

Wilson has not identified any evidence to show that similarly situated non-African American employees were treated more favorably. There is no evidence of any employees with the same job description who were subject to the same standards and reported to the same supervisor. Moreover, Wilson has not identified any other employees who acted in a similarly insubordinate fashion but were allowed to keep their jobs or any part-time employees who received longer hours or breaks.

Furthermore, even if Wilson could establish a *prima facie* case, ADM has proffered legitimate, nondiscriminatory reasons for limiting her hours and breaks and terminating her employment. The only evidence of any changes in Wilson's hours shows that they were originally reduced at her request and later temporarily increased at her request. The only evidence regarding any limits on her breaks shows that she was provided the breaks to which she was entitled by company policy and applicable rules.

With regard to her termination, ADM has identified sufficient, undisputed evidence to show that Wilson was fired for cause. Following a meeting about Wilson's use of breaks, Wilson became angry, left the meeting, and had a phone call during which her supervisor thought she gave his address to the caller in a threatening manner. This is the only reason that was provided for her termination, and Wilson has identified no evidence to show that that reason was mere pretext. The decision to terminate Wilson was made by Beals and Carlson, and there is no evidence to even suggest that they did not believe Wilson had engaged in inappropriate conduct. When the decision maker honestly believed the nondiscriminatory reason given for an adverse employment action, the reason is not pretextual. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012

(7th Cir. 2004). Moreover, "it is not [the court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) (*Stephens*); *see also Balance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005) ("We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined."). Accordingly, ADM is entitled to judgment on any claim that Wilson's hours or breaks were reduced or that she was terminated for discriminatory reasons.

### Hostile Work Environment

To succeed on a claim for hostile work environment, Wilson must show that her environment "was so pervaded by racial harassment as to alter the terms and conditions of [her] employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768 (1998). The Court must consider "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Wilson's list of allegedly harassing conduct does not warrant any detailed discussion. With the exception of the comment Reed made in her presence about another employee's being disabled because he is black and a few comments about Wilson's hair or skin color, Wilson's Local Rule 56.1 materials do not identify any racially harassing conduct that was directed at her by someone at ADM. These isolated comments do not

19

rise to the level of pervasive discriminatory conduct that was severe enough to alter the

terms and conditions of her employment. Thus, ADM is entitled to judgment as a matter

of law on any claim of a racially hostile work environment.

*Retaliation*

A plaintiff can defeat a motion for summary judgment on a retaliation claim under

a direct or indirect method of proof. *Stephens*, 569 F.3d at 786.[5] Under the direct

method, she must demonstrate: (1) that she engaged in a statutorily protected activity;

(2) that she suffered a materially adverse action; and (3) a causal connection between the

two. *Id.* Without evidence of a causal connection, a plaintiff must proceed under the

indirect method of proof. *Id.* Under that method, the first two elements remain the same,

but instead of proving a causal connection, the plaintiff must show that she was

performing her job in a satisfactory manner and that she was treated less favorably than a

similarly situated employee who did not complain of discrimination. *Id.* at 786-87.

ADM does not dispute that Wilson engaged in protected activity by filing an

EEOC charge on December 7, 2007, and that Carlson and Beals were aware of that fact

when they decided to terminate Wilson's employment. Nor is there any dispute that

termination constitutes an adverse employment action. What is lacking, however, is any

evidence of a causal connection between the two. Carlson and Beals provided sworn

statements that Wilson's EEOC charge played no part in the decision to terminate

Wilson's employment, and Wilson did not identify any evidence to dispute those

statements. Moreover, the fact that over four months transpired between the time Wilson

---

[5] The elements of retaliation are the same for claims asserted under Title VII and § 1981. *Stephens*, 569 F.3d at 786.

filed her EEOC charge and the time Carlson and Beals decided to terminate her employment counsels against finding a causal connection between the two acts. *Cf. Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002) (finding that three-month interval between filing of EEOC charge and termination, without more, was too long to support an inference of retaliation).

Without any direct evidence of a causal connection, Wilson must offer proof that she was performing her job in a satisfactory manner and that she was treated less favorably than similarly situated employees. For the reasons discussed above regarding her discrimination claim, she cannot. Accordingly, ADM is entitled to judgment on any claim of retaliation.

*Costs and Fees*

As a final matter, ADM asks for an award of costs and fees in its motion for summary judgment but makes no effort to justify that request in its supporting memorandum. Unsupported and conclusory arguments need not be considered. *See, e.g., Hunt ex rel. Chiovari v. Dart*, 612 F. Supp. 2d 969, 977 n.10 (N.D. Ill. 2009) (compiling cases). Accordingly, the request for costs and fees is denied.

**CONCLUSION**

For the reasons stated above, ADM's Motion for Summary Judgment is granted on all claims asserted in Wilson's Complaint. ADM's request for an award of costs and fees is denied.

Date: _June 8 2011_

_JOHN W. DARRAH_
United States District Court Judge